Approved: _____
          Eli J. Mark/Daniel C. Richenthal
          Assistant United States Attorneys
          Alona Katz
          Special Assistant United States Attorney

Before:   THE HONORABLE KEVIN NATHANIEL FOX
          United States Magistrate Judge
          Southern District of New York

**19 MAG 9340**

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :    **SEALED COMPLAINT**

        - v. -                        :    Violations of
                                           18 U.S.C. §§ 371, 657,
                                      :    1344, 1349, and 2; 21
JOSEPH GUAGLIARDO,                         U.S.C. §§ 841, 846
    a/k/a "Joseph Gagliardo,"         :

                Defendant.            :    COUNTY OF OFFENSE:
                                           NEW YORK
                                      :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     LAVALE JACKSON, being duly sworn, deposes and says that he
is a Special Agent with the United States Attorney's Office for
the Southern District of New York ("USAO-SDNY"), and charges as
follows:

COUNT ONE
(Conspiracy to Embezzle from a Credit Union)

     1.   From at least in or about 2009, up to and
including at least in or about May 2018, in the Southern
District of New York and elsewhere, JOSEPH GUAGLIARDO, a/k/a
"Joseph Gagliardo," the defendant, and others known and unknown,
willfully and knowingly did combine, conspire, confederate, and
agree together and with each other to commit an offense against
the United States, to wit, embezzlement, in violation of Title
18, United States Code, Section 657.

     2.   It was a part and object of the conspiracy that
JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, an
officer, agent and employee of an institution, the accounts of
which are insured by the National Credit Union Administration
Board, would and did embezzle, abstract, purloin and willfully
misapply money, funds, credits, securities, and other things of

value belonging to such institution, in violation of Title 18, United States Code, Section 657, to wit, GUAGLIARDO, then a Supervisory Committee member of Municipal Credit Union (the "Credit Union"), agreed to embezzle and willfully misapply money from the Credit Union by arranging payments to (1) a purported security company that he controlled ("Security Company-1") and (2) a non-profit organization that he controlled ("Organization-1"), among other expenditures of Credit Union money for GUAGLIARDO's benefit.

<u>Overt Act</u>

3.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York:

a.    On or about December 7, 2017, JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, emailed an invoice on behalf of Security Company-1 to a Vice President of the Credit Union requesting payment of $10,584 for purported services inspecting Credit Union ATMs.

(Title 18, United States Code, Section 371.)

<u>COUNT TWO</u>
(Embezzlement from a Credit Union)

4.    From at least in or about 2009, up to and including at least in or about May 2018, in the Southern District of New York and elsewhere, JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, an officer, agent and employee of an institution, the accounts of which are insured by the National Credit Union Administration Board, embezzled, abstracted, purloined and willfully misapplied money, funds, credits, securities, and other things of value belonging to such institution, to wit, GUAGLIARDO, then a Supervisory Committee member of the Credit Union, embezzled and willfully misapplied money from the Credit Union by arranging payments to Security Company-1 and Organization-1, among other expenditures of Credit Union money for GUAGLIARDO's benefit.

(Title 18, United States Code, Sections 657 and 2.)

2

COUNT THREE
(Conspiracy to Defraud a Financial Institution)

5.    From at least in or about 2009, up to and
including at least in or about May 2018, in the Southern
District of New York and elsewhere, JOSEPH GUAGLIARDO a/k/a
"Joseph Gagliardo," the defendant, and others known and unknown,
knowingly did combine, conspire, confederate and agree together
and with each other to commit an offense against the United
States, to wit, defrauding a financial institution, in violation
of Title 18, United States Code, Section 1344.

6.    It was a part and object of the conspiracy that
JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, and
others known and unknown, would and did knowingly execute a
scheme and artifice to defraud a financial institution, and to
obtain moneys, funds, credits, assets, securities, and other
property owned by, and under the custody and control of, such
financial institution, by means of false and fraudulent
pretenses, representations, and promises, in violation of Title
18, United States Code, Section 1344, to wit, GUAGLIARDO agreed
to defraud the Credit Union in connection with payments the
Credit Union made to Security Company-1 and Organization-1,
among other expenditures of Credit Union money for GUAGLIARDO's
benefit.

(Title 18, United States Code, Section 1349.)

COUNT FOUR
(Defrauding a Financial Institution)

7.    From at least in or about 2009, up to and
including at least in or about May 2018, in the Southern
District of New York and elsewhere, JOSEPH GUAGLIARDO a/k/a
"Joseph Gagliardo," the defendant, knowingly executed a scheme
and artifice to defraud a financial institution, and to obtain
moneys, funds, credits, assets, securities, and other property
owned by, and under the custody and control of, such financial
institution, by means of false and fraudulent pretenses,
representations, and promises, to wit, GUAGLIARDO defrauded the
Credit Union in connection with payments the Credit Union made
to Security Company-1 and Organization-1, among other
expenditures of Credit Union money for GUAGLIARDO's benefit.

(Title 18, United States Code, Sections 1344 and 2.)

COUNT FIVE
(Conspiracy to Distribute Controlled Substances)

8.   From at least in or about 2011, up to and
including at least in or about January 2018, in the Southern
District of New York and elsewhere, JOSEPH GUAGLIARDO, a/k/a
"Joseph Gagliardo," the defendant, and others known and unknown,
intentionally and knowingly did combine, conspire, confederate,
and agree together and with each other to violate the narcotics
laws of the United States.

9.   It was a part and an object of the conspiracy
that JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant,
and others known and unknown, would and did distribute and
possess with the intent to distribute controlled substances, in
violation of 21 U.S.C. § 841(a)(1).

10.   The controlled substances that JOSEPH GUAGLIARDO,
a/k/a "Joseph Gagliardo," the defendant, conspired to distribute
and possess with the intent to distribute were hydrocodone, in
violation of Title 21, United States Code, Section 841(b)(1)(C),
and codeine, in violation of Title 21, United States Code,
Section 841(b)(1)(E).

(Title 21, United States Code, Section 846.)

COUNT SIX
(Distribution of Controlled Substances)

11.   From at least in or about 2011 up to and
including at least in or about January 2018, in the Southern
District of New York and elsewhere, JOSEPH GUAGLIARDO, a/k/a
"Joseph Gagliardo," the defendant, and others known and unknown,
intentionally and knowingly distributed and possessed with the
intent to distribute controlled substances, to wit, hydrocodone,
in violation of Title 21, United States Code, Section
841(b)(1)(C), and codeine, in violation of Title 21, United
States Code, Section 841(b)(1)(E).

(Title 21, United States Code, Section 841(a)(1); Title 18,
United States Code, Section 2.)

The bases for my knowledge and for the foregoing
charges are, in part, as follows:

12.   I am a Special Agent with the USAO-SDNY, and have
been in that position for approximately five years.  For over

the past year, I have been personally involved in the
investigation of this matter, along with other Special Agents of
the USAO-SDNY, and with the assistance of the New York State
Department of Financial Services ("NYS-DFS") and the New York
County District Attorney's Office.  Previously, I was a Special
Agent with the U.S. Department of Labor-Office of Inspector
General ("DOL-OIG") for over nine years.  While with the USAO-
SDNY and DOL-OIG, I have participated in multiple investigations
of corruption and fraud offenses, including those involving non-
profit institutions.

13.  I am familiar with the facts and circumstances
set forth below from my participation in the investigation of
this matter, from my personal knowledge, from my conversations
with other law enforcement agents and personnel, and witnesses,
and from my examination of various reports and records.  Because
this affidavit is being submitted for the limited purpose of
demonstrating probable cause, it does not include all the facts
that I have learned during the course of my investigation.  In
addition, due to the ongoing nature of the investigation, and
the monetary calculations are based on the records obtained to
date and are approximates, unless otherwise noted.  Where the
contents of documents and the actions, statements, and
conversations of others are reported herein, they are reported
in substance and in part, except where otherwise indicated.

## Overview

14.  The charges in this Complaint result from a
scheme involving corruption and fraud at Municipal Credit Union,
*i.e.*, the Credit Union, a multi-billion dollar non-profit and
the oldest credit union in New York State.  Since in or about
2017, the USAO-SDNY has been investigating wrongdoing that has
harmed the Credit Union and its members, including criminal
misconduct committed by or with the knowledge of certain members
at the highest levels of the organization.

15.  As described in greater detail below, the
investigation has revealed that JOSEPH GUAGLIARDO a/k/a "Joseph
Gagliardo," the defendant, a former New York City Police
Department officer and member of the Credit Union's Supervisory
Committee, engaged in a long-running scheme to defraud the
Credit Union, with the agreement and assistance of, among
others, Kam Wong, the Credit Union's former Chief Executive
Officer and President.  Among other things, GUAGLIARDO, with the
agreement and assistance of Wong, defrauded and embezzled from
the Credit Union by causing the Credit Union to direct more than
$200,000 to a purported security company created and controlled

by GUAGLIARDO, but operated in another's name, which did little
to no real work for the Credit Union.   GUAGLIARDO, with the
agreement and assistance of Wong, further defrauded and
embezzled from the Credit Union by over-billing the Credit Union
for more than $200,000 for purported web-advertising services
provided by a non-profit organization that GUAGLIARDO also
controlled.

      16.   In addition, during substantially the same period
in which JOSEPH GUAGLIARDO a/k/a "Joseph Gagliardo," the
defendant, was committing and concealing these offenses,
GUAGLIARDO repeatedly distributed to Kam Wong controlled
substances, some of which were prescription opiates obtained
from GUAGLIARDO's spouse, who worked as a doctor at a public
hospital.

Relevant People and Entities

      17.   I have learned the following based on my
interviews of current and former employees of the Credit Union,
my interviews of former employees of Security Company-1, my
review of records obtained from the Credit Union, my review of
records obtained from other entities, and my review of publicly-
available information:

      a.   Municipal Credit Union (sometimes referred
to as "MCU," and generally referred to herein as the "Credit
Union"), with headquarters in downtown Manhattan, is the oldest
credit union in New York State and one of the oldest and largest
in the country.   The Credit Union is regulated and supervised by
NYS-DFS and the National Credit Union Administration ("NCUA"),
the latter of which is a federal agency that insures deposits at
credit unions.

      b.   The Credit Union is a not-for-profit
financial institution that is cooperatively owned by its
customers, who are known as "members."   The Credit Union, in
contrast to for-profit financial institutions, is designed to
focus on serving members, rather than on making a profit for
shareholders.   As a result, the Credit Union's earnings are
intended to go back to members in the form of more favorable
rates and fewer and lower fees for products and services.

      c.   The Credit Union presently provides banking
services to more than 500,000 members and has more than $2.9
billion in member accounts, each of which is federally insured
for at least $250,000 by the National Credit Union Share
Insurance Fund, which is administered by the NCUA.   Membership

in the Credit Union is generally available to employees of New York City and its agencies, employees of the federal and New York state governments who work in New York City, employees of hospitals, nursing homes and similar facilities located within New York State, and others who are eligible as specified in the Credit Union's bylaws.

        d.    At all times relevant to this Complaint, the Credit Union was supposed to be overseen by a Board of Directors (the "Board") and a Supervisory Committee (the "Supervisory Committee"), each of which was composed of volunteer members of the Credit Union, who were not to be compensated.  According to New York banking law, the Supervisory Committee's duties included supervision of the actions of the Credit Union's Board and officers.[1]  The Credit Union's written conflict of interest policy, which was regularly distributed to Board members, Supervisory Committee members, and others, provided, among other things, that members of the Credit Union's "Board of Directors and Supervisory Committee may not do business with the Credit Union, either individually or as representative of any business entity."[2]

        e.    JOSEPH GUAGLIARDO a/k/a "Joseph Gagliardo," the defendant, is a former officer with the New York City Police Department, who retired in or about 1989.  In or about 1993, GUAGLIARDO joined the Supervisory Committee of the Credit Union, a volunteer position, and remained in that position until he was removed from that position by NYS-DFS on or about May 24, 2018, except for a brief period of time when he served as a member of the Credit Union's Board in or about 2008.  While he was a Supervisory Committee member, GUAGLIARDO sought to and did use his position to oversee aspects of the Credit Union's security and fraud department, including serving in the role of vice

---

[1]    Based on my review of documents, I have learned that, on or about May 24, 2018, NYS-DFS issued an order removing all members of the Supervisory Committee, and on or about June 22, 2018, NYS-DFS issued an order removing all members of the Board as a result of significant concerns regarding the Board's oversight of the Credit Union's operations.

[2]    Based on my review of documents, I have learned that the conflict of interest policy was part of the Credit Union's policy manual, which was regularly distributed to the Board and Supervisory Committee, among others.

president of the Credit Union's security and fraud department
while that position was vacant.

        f.    At all relevant times to this Complaint,
GUAGLIARDO's spouse worked as a dermatologist affiliated with a
public hospital in Brooklyn, New York.

        g.    Security Company-1 was incorporated in New
York State by a lawyer and friend of GUAGLIARDO ("Individual-
1"), in or about August 2017.  Security Company-1 had the same
name as another organization GUAGLIARDO created several years
earlier, which purported to provide services to law enforcement
members, and was, at all relevant times, a vanity plate on one
of GUAGLIARDO's vehicles.  At all relevant times to this
Complaint, GUAGLIARDO was the *de facto* owner and operator of
Security Company-1, effectively controlling its finances,
preparing invoices, and hiring and supervising its employees,
all of whom were connected to GUAGLIARDO.  Security Company-1's
sole customer was the Credit Union, which paid it hundreds of
thousands of dollars purportedly to inspect ATMs operated by the
Credit Union.  As described in greater detail below, GUAGLIARDO,
who had no official role at Security Company-1, then directed
Individual-1 to disburse the vast majority of those payments
from the Credit Union to Security Company-1 to GUAGLIARDO and
GUAGLIARDO's family members, or to make payments for their
benefit.

[handwritten: the name of which was ④]

        h.    Organization-1 was incorporated in New York
State in or about July 1975, was registered by GUAGLIARDO as a
501(c)(3) charitable organization with the Internal Revenue
Service in or about June 2006, and was registered by GUAGLIARDO
with the New York State Attorney General's Office's Charities
Bureau in or about November 2006.  Its tax documents filed with
the Internal Revenue Service described its mission as "to
promote Italian culture."  At all times relevant to this
Complaint, GUAGLIARDO was the President of Organization-1.

        i.    Although, as a charitable organization,
Organization-1 was required to file annual tax forms and annual
reports with the New York State Attorney General's Office's
Charities Bureau, Organization-1 has not done so for multiple
years.

        j.    Records maintained by Organization-1's
former accountant reflect that for 2013 and 2014, the years for
which that accountant filed Organization-1's tax returns, the
organization had only one significant corporate donor, the
Credit Union.  The records also reflect that the majority of

Organization-1's income during those years was spent on
entertainment expenditures, including a holiday party, dinner
dances, meals for alleged meetings, breakfasts and dinners for
other organizations, golf sponsorships for other organizations,
apparel, and commemorative coins.

        k.    From in or around at least 2007 until on or
about June 12, 2018, Kam Wong served as the Credit Union's CEO
and President.  As the Credit Union's CEO, among other things,
Wong approved contracts and directed payments and contributions
to vendors.  On or about May 8, 2018, Wong was charged and
arrested by the USAO-SDNY, and, on or about June 12, 2018, Wong
was terminated by the Credit Union.  On or about December 2,
2018, Wong pled guilty to embezzlement from the Credit Union,
and acknowledged, in his written plea agreement, among other
things, agreeing with one or more others to do the same.

<u>Relevant Credit Union Policies</u>

        18.    Based on my review of documents obtained from the
Credit Union, I have learned the following:

        a.    During at least the relevant time period,
the Credit Union had a policy manual, which included policies
regarding potential conflicts of interest and ethics, and
required Supervisory Committee and Board members to complete
annual disclosure statements to ensure compliance with these
policies.

        b.    At all relevant times, the Credit Union's
"Insider's Disclosure Policy" provided that "[m]embers of [the
Credit Union]'s Board of Directors and Supervisory Committee may
not do business with the [Credit Union], either individually or
as representative of any business entity."  The policy provided
further that "upon the discovery of a conflict of interest,
potential conflict of interest, or the appearance of a conflict
of interest, involving [the Credit Union], a board member or
supervisory committee member shall immediately report such
incident, in writing to the Board."

        c.    At all relevant times, the Credit Union's
"Code of Ethics" provided that the Credit Union's "elected or
appointed officials have an obligation to the [C]redit [U]nion
that extends beyond assuring that their actions do not violate
applicable laws and regulations.  They are fiduciaries who owe
it to the [C]redit [U]nion to act in good faith in the
performance of their duties.  An elected official of [the Credit
Union] must recognize that the interests of the [C]redit [U]nion

have priority over his or her personal interest.  An elected [Credit Union] official may not use his or her position for personal gain or profit."

        d.    JOSEPH GUAGLIARDO a/k/a "Joseph Gagliardo," the defendant, was sent a copy of the Credit Union's policy manual by email to his Credit Union account on multiple occasions, including prior to August 2017, and within his role on the Supervisory Committee, his responsibilities included overseeing audits of the Board and the Credit Union's compliance with provisions of the policy manual.[3]

        e.    At all relevant times, GUAGLIARDO completed an annual written disclosure statement, which required him to disclose any conflict of interest, potential conflict of interest, or appearance of a conflict of interest, and further required him to "agree to disclose any conflicts which may arise in the future." GUAGLIARDO signed the disclosure statements annually, including each year from 2009 through 2017, certifying that he did not have any conflicts of interest, potential conflicts of interest, or appearances of a conflict interest.

        f.    At all relevant times, the Credit Union's contract policy provided, in pertinent part, that "[c]ontracts shall be entered into by [the Credit Union] for the purpose of obtaining goods and services for the operations of the Credit Union." All contracts "shall be forwarded to the Legal Department, together with a memo from the head of the department detailing: (i) the purpose of the contract; (ii) business terms of the contract negotiated; and (iii) any suggestion or needs of [the Credit Union] not reflected in the proposed contract." The Legal Department must then review the contract "and, where appropriate, further negotiation, with the party proposing such contractual relationship shall be undertaken."  After execution, "[t]he Department Head must send the original executed contract to the Legal Department."

---

[3]    Based on my review of documents, I have learned that GUAGLIARDO was sent the policy manual at least on or about February 23, 2010, March 8, 2012, May 14, 2013, February 24, 2016, and May 1, 2018.

<u>The Security Company-1 Scheme</u>

19.    As described in greater detail below, the
investigation has revealed that JOSEPH GUAGLIARDO, a/k/a "Joseph
Gagliardo," the defendant, with the agreement and assistance of
Kam Wong, sought to and did embezzle from and defraud the Credit
Union in multiple ways, including by requesting and receiving
payments for Security Company-1 at inflated amounts, for little
to no real work, and in violation of the Credit Union's conflict
of interest policy.   In furtherance of this scheme, GUAGLIARDO
sought to hide his ownership and financial interest in Security
Company-1.

> *GUAGLIARDO Causes Individual-1 to Create Security
> Company-1*

20.    Based on my interviews of Individual-1 and my
review of documents, I have learned, among other things:

a.    In or about Summer 2017, JOSEPH GUAGLIARDO,
a/k/a "Joseph Gagliardo," the defendant, met with Individual-1,
a lawyer and longtime friend, to discuss setting up a company,
*i.e.*, Security Company-1.

b.    On or about August 25, 2017, Individual-1
filed a certificate of incorporation with New York State for
Security Company-1.   Individual-1 also opened up a bank account
in the name of Security Company-1 and obtained an employer
identification number from the Internal Revenue Service for the
new company.

21.    Based on my review of documents obtained from the
Credit Union and my interviews of current and former employees
of the Credit Union, I have learned the following:

a.    On or about August 2, 2017, Kam Wong texted
JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, from
Wong's Credit Union cellphone, writing: "We'll talk more on
physical security.   It will be your baby, and I am counting on
you."

b.    On or about October 26, 2017, Wong, at a
regularly scheduled Board meeting, submitted a "CEO Report,"
which stated that "Security and Fraud will engage a consultant
to conduct a through physical security review to identify
necessary enhancements to safeguard the credit union," and that
"Operating Departments and the Security and Fraud Department
will prepare an ATM security plan to deter and minimize ATM

fraudulent activities such as skimming device detection's."  The
CEO Report did not mention that the Credit Union would hire a
person or company affiliated with GUAGLIARDO.

        c.   Also on or about October 30, 2017, Wong
emailed GUAGLIARDO that Wong had authorized the Credit Union's
vice president of the security and fraud department ("Vice
President-1") -- who was a long-time friend of GUAGLIARDO -- "to
do whatever are [sic] needed to enhance ATM security."
Subsequently, on or about November 1, 2017, Vice President-1,
in response to a question from the Chief Retail Banking
Operations Officer about whether an email from what appeared to
be a Security Company-1 email account was a "legitimate
contact," emailed the Chief Retail Banking Operations Officer
that the Credit Union retained Security Company-1 "short term to
inspect ATMs and respond to skimming alarms during off hours."
Vice President-1 then forwarded the email chain to GUAGAGLIARDO's
Credit Union email account.  The Security Company-1 email
referred to above was not signed by GUAGLIARDO, but rather was
signed in the name of an individual known to be friends with
GUAGLIARDO ("Friend-1").[4]

        d.   On or about November 6, 2017, Vice
President-1 emailed a "Memo of Understanding" for Security
Company-1 (the "MOU") to Wong "for your records as discussed."
The MOU, which was dated October 14, 2017, stated that it was
from Individual-1, who was identified as the "Exec Dir" of
Security Company-1. It further stated that Credit Union-1
"requires an independent review of its physical security process
on a regular course of action and identified certain
responsibilities of Security Company-1, including responding to
"skimmer alerts," and "inspect[ing] all facilities agreed upon
with" the Vice President of Retail Banking (whose name was
misspelled).  The MOU stated that Security Company-1's
"Inspectors are trained in inspection [Brand-1] ATMs, especially
[Credit Union-1] Machines."  The MOU, which was a page and a

---

[4]   Based on my interviews of Friend-1, I have learned that
Friend-1 did not send this email and did not do any work for or
on behalf of Security Company-1, although, based on my review of
documents, I have learned that his name was repeatedly listed as
the author of many of Security Company-1's emails to the Credit
Union, on various Security Company-1 invoices and reports
submitted to the Credit Union, and as a subscriber for Security
Company-1's phone number.

half, included numerous other typographical and grammatical errors, and irregular formatting.

    e. Subsequently, on or about November 17, 2017, GUAGLIARDO, from his personal email account, sent an email to Wong's Credit Union email account updating Wong on Security Company-1's services. GUAGLIARDO stated he was "helping [Vice President-1] and this group work on our physical security issue." GUAGLIARDO stated, "Nightly we have 6 to 8 people visiting all of the top transaction ATMs as well as location [*sic*] we have been hit. The inspections give MCU an Omni Presence as well as a surveillance of security."

    f. Although the Credit Union's policy manual required that contracts be reviewed by the legal department, Security Company-1's services were not memorialized in a formal contract, as required, and the MOU was not reviewed by the legal department. Rather, Security Company-1's services were approved by Vice President-1 and Wong without any apparent analysis or consultation with the legal department.

   *GUAGLIARDO Causes the Credit Union to Pay Security Company-*
   *1 Thousands of Dollars for Purported Services*

   22. Based on my review of records obtained from the Credit Union and my interviews of current and former employees of the Credit Union, I have learned the following:

    a. Beginning on or about November 1, 2017 and continuing through on or about May 1, 2018 -- shortly before Wong's arrest -- Security Company-1 submitted approximately 17 invoices (collectively, the "Invoices") to the Credit Union, totaling approximately $256,689, all of which were paid. While CEO, Wong authorized the payment of these invoices; after Wong was placed on leave on or about February 22, 2018, the acting-CEO ("Acting CEO") continued to approve the invoices for several additional months.

    b. The Invoices to the Credit Union each stated that Security Company-1 "is a consortium of trained law enforcement and security specialist [*sic*] with decades of service. Trained professionals together since 1978 as A.I. Services."

    c. The Invoices billed the Credit Union for inspections of ATMs at the rate of $135 per location, and

identified 14 Locations that, according to the invoices, were
being inspected each day.[5]

> d.   While the Invoices identified the names of
various Security Company-1 employees, they made no mention of
JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant,
whose name appeared nowhere on them.

> e.   The Invoices directed payment in the care of
Individual-1 and listed a phone number, email address, and
website for Security Company-1.

> 23.   Based my interviews of Individual-1, I have
learned, among other things, the following:

> a.   Security Company-1 was not "a consortium of
trained law enforcement and security specialist[s] with decades
of service," and those working for Security Company-1 had not
been working together "since 1978," as Security Company-1 was
described in the Invoices.

> b.   Although the MOU to Vice President-1 stated
it was "from" Individual-1 on behalf of Security Company-1,
Individual-1 did not author the MOU and had never seen the MOU
before reviewing it at the request of law enforcement.

> c.   Individual-1 did not perform any services
for the Credit Union, direct that any services be provided to
the Credit Union, or hire or supervise anyone to provide any
services to the Credit Union.

> d.   Individual-1 did not prepare reports or
invoices on behalf of Security Company-1 to be sent to the
Credit Union, and had not seen any Invoices or Security Company-
1 reports prior to reviewing them at the request of law
enforcement.

> e.   The phone number listed on the Invoices did
not belong to Individual-1.

> f.   The email address listed on the Invoices was
set up by JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the

------

[5]   Beginning with the invoice dated November 20, 2017, the
billed rate included a purported "20% fee reduction," which was
eventually increased after Kam Wong was placed on leave to 50%.

defendant, and Individual-1 did not have access to this email account.

g.    The website listed on the Invoices was also set up by GUAGLIARDO, and Individual-1 had not visited the site prior to first being interviewed by law enforcement.

24.    Based my review of records obtained from the provider of the email address for Security Company-1 on the Invoices, I have learned that the domain for the email account was paid for and subscribed to by JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant.

*Security Company-1's Services Were of Little to No Apparent Benefit to the Credit Union*

25.    Based on my review of records obtained from the Credit Union and my interviews of current and former employees of the Credit Union and Security Company-1, I have learned the following:

a.    Security Company-1 billed the Credit Union $135 per inspection of each ATM location, and invoiced the Credit Union for nightly inspections and re-inspections of the same fourteen ATM locations for a total of $1,890 per night, while Security Company-1 paid three employees, who were generally untrained friends of JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, a small fraction of that to perform the inspections.[6]

b.    Although the MOU stated that inspections of locations would be done in coordination with and consultation with the Credit Union's then-Chief Member Service Operations Officer, the then-Chief Member Service Operations Officer was not aware of the MOU, had not previously reviewed it, and was not consulted on the alleged need for inspections by Security Company-1 at any ATM locations.

c.    Security Company-1 listed various individuals on emails, reports and invoices; however, some of these individuals did not perform any services for Security Company-1.

---

[6]    As noted above, some of the Invoices discounted the standard charge to the Credit Union for these services.

d.    Security Company-1 stated in its MOU, emails, and invoices that its work was performed by former law enforcement and security professionals; however, the majority of work was performed by two employees with no law enforcement and/or security background.

26.    Based on my review of Credit Union and financial records, I have learned that, in total, the Credit Union paid Security Company-1 $256,689 for its purported services inspecting the same fourteen ATM locations nightly, between October 2017 and May 2018.  During that same period of time, Security Company-1, at the direction of JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, paid the Employees only approximately $24,000, while GUAGLIARDO directed more than $80,000 to himself and his family members, as explained further below.[7]

27.    Based on my interviews of Individual-1, and my review of Security Company-1's records, I have learned that, as noted above, Security Company-1 paid three individuals, Employee-1, Employee-2, and Employee-3 (collectively, the "Employees") to inspect the Credit Union's ATMs.

28.    Based on my review of Security Company-1's records, and my interviews of the Employees, I have learned the following:

a.    JOSEPH GUAGLIARDO, a/k/a, "Joseph Gagliardo," the defendant, asked each of the Employees to inspect Credit Union ATMs, and each did so for a period of time, collectively, between in or about October 2017 and in or about May 2018.[8]  During the period of time when each of them worked,

---

[7]    In addition, and as detailed further below, on or about May 23, 2018, law enforcement agents executed a search of GUAGLIARDO's home, pursuant to a judicially-authorized search warrant, at which time additional checks written to him and his family members, totaling more than $35,000, as well as checks written to two employees, which had not yet been deposited, were seized.

[8]    In particular, Employee-1 worked for Security Company-1 from in or about January 2018 until in or about May 2018; Employee-2 worked for Security Company-2 from in or about October 2017 until in or about May 2018; and Employee-3 worked for Security Company-1 from in or about November 2017 until in or about December 2017.

they inspected and re-inspected the same set of ATM locations nightly, looking for any tampering of ATMs, problems with lighting and cleanliness of the locations, as well vagrancy in the locations.  GUAGLIARDO directed that the Employees report any found vagrants to the police.

b.   The only person at Security Company-1 that the Employees dealt with, and the only person who provided them with direction, was GUAGLIARDO.  The Employees were not aware of any other supervisor, nor were the Employees aware of a headquarters and/or office space for Security Company-1.

c.   GUAGLIARDO agreed to and did pay the Employees substantially less than what Security Company-1 charged the Credit Union for its purported services. Specifically, GUAGLIARDO agreed to pay Employee-1 $125 per night for visiting and inspecting approximately seven ATM locations, and also provided him an additional $30 per night to cover certain expenses.  GUAGLIARDO agreed to pay Employee-2 $100 per night for inspecting approximately seven ATM locations, along with money for expenses, including for cigars, food, and gas. Employee-3 was paid $600 for visiting several ATM locations approximately twice per week for several weeks.

d.   The Employees' review of the various ATM locations did not take much time.  For example, Employee-1 traveled to and inspected seven ATM locations in approximately four hours.

e.   The Employees did not have any prior experience and/or meaningful training inspecting ATMs, other than a brief demonstration provided by GUAGLIARDO.  Employee-1 and Employee-2 also did not have any prior law enforcement experience.  Employee-3, who briefly worked for Security Company-1, was a former police officer.  None of the Employees had previously worked together.

29.   Based on my interview of the Credit Union's acting Chief Risk Officer (the "Chief Risk Officer"), who was hired after Kam Wong's termination, I have learned that, in the Chief Risk Officer's opinion:

a.   The MOU with Security Company-1 included clauses, terms and pricing that were not comprehensible, and the MOU would not have been approved if it had been reviewed by the Legal Department.

17

     b.   Security Company-1's reports to the Credit Union did not provide any value to the Credit Union. The reports did not address risk issues, did not demonstrate that the vendor had indeed performed the services, and did not demonstrate a rationale for the purported work performed.

     c.   The Invoices failed to describe sufficiently the services that were billed for; and, in addition, the amount billed, *i.e.*, $135 per visit to an ATM location per day, was not a fair and reasonable price for the work purportedly performed by Security Company-1.

> *GUAGLIARDO Directs Security Company-1 to Pay Him and His Family Members and Withdraws Tens of Thousands of Dollars in Cash*

     30.   Based on my interviews of Individual-1 and review of Security Company-1's bank records, I have further learned the following:

     a.   The money that went from the Credit Union into Security Company-1's bank account was then moved and/or transferred by Individual-1 at the request of JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant. Individual-1 also signed checks at GUAGLIARDO's request. The majority of the money that was withdrawn from Security Compnay-1 was payable to GUAGLIARDO and/or GUAGLIARDO's family members, specifically GUAGLIARDO's spouse, a dermatologist (who served as Individual-1's dermatologist), and GUAGLIARDO's adult daughter ("Guagliardo's Daughter"), a dental assistant in Florida.

     b.   GUAGLIARDO told Individual-1, in substance and in part, that the money payable to GUAGLIARDO was for, among other things, (i) office space for Security Company-1 at a building that GUAGLIARDO owned and (ii) a vehicle purchase or rental for Security Company-1. Individual-1 never saw the office space that GUAGLIARDO allegedly provided for Security Company-1 and was not aware of whether Security Company-1 even had an office. Moreover, while GUAGLIARDO told Individual-1 that a certain vehicle was used for the work of Security Company-1, Individual-1 does not know whether it was so used.

     c.   GUAGLIARDO told Individual-1 that GUAGLIARDO paid his own spouse and daughter because his spouse and daughter were going to help create a healthcare program or policies concerning healthcare information for Security Company-1; however, Individual-1 was not aware of any work actually performed by GUAGLIARDO's spouse or daughter for Security

Company-1 and never saw any work product.  At GUAGLIARDO's request, Individual-1 wrote tens of thousands of dollars in checks to GUAGLIARDO's spouse and/or daughter, including one check to each of them in or about late May 2018, for a total of $30,000.

        d.    At GUAGLIARDO's request, Individual-1 also wrote a check from Security Company-1 to the Internal Revenue Service to cover taxes Guagliardo's Daughter allegedly incurred as a result of the money GUAGLIARDO had directed to her from Security Company-1, as described above.

        31.   On or August 3, 2018, I participated in an interview of Guagliardo's Daughter.  During that interview, Guagliardo's Daughter informed me, among other things:

        a.    Guagliardo's Daughter is a dental assistant who lives in Florida, and had not been in New York in nearly ten years.

        b.    JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, and Guagliardo's Daughter discussed Guagliardo's Daughter performing consulting for Security Company-1, but other than talking with her father, Guagliardo's Daughter did no such work.

        c.    Guagliardo's Daughter never received any compensation from Security Company-1.

        d.    Upon being shown a copy of a check for $25,000 addressed to her from Security Company-1, which was deposited into Guagliardo's Daughter's Credit Union account, Guagliardo's Daughter stated that (i) her father had access to that account and (ii) the signature on the back of the check is not hers.

        32.   On or August 6, 2018, I participated in a second interview of Guagliardo's Daughter.  During that interview, Guagliardo's Daughter informed me, in substance and in part, that the $25,000 check deposited into her Credit Union bank account was for college/school, and repeated that she did not do any work for Security Company-1.

        33.   On or about June 19, 2018, I visited and photographed the building that JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," had told Individual-1 was being rented as office space for Security Company-1.  The building had no marking or

signage indicating that Security Company-1 occupied or had occupied any space there. Based on my review of publicly-available New York City property records, I know that GUAGLIARDO is the sole owner of that building, and has been since at least 1990.

34. Based on my review of bank records for Security Company-1 and the Credit Union, as well as Security Company-1 checks that were seized on or about May 23, 2018, pursuant to a judicially-authorized search warrant, from the residence of JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, I have learned that there was a total of more than $130,000 in checks drawn from the Security Company-1 account made out to GUAGLIARDO and his family members, as described further below:

a. Between December 26, 2017 and March 12, 2018, Security Company-1 wrote checks totaling more than $80,000 to GUAGLIARDO, GUAGLIARDO's spouse, and GUAGLIARDO's Daughter, all of which were deposited and/or cashed. In addition, a February 9, 2018 check was written to GUAGLIARDO's Daughter for $15,000 and was initially deposited by GUAGLIARDO, but was not honored because of a missing signature, and on April 17, 2018, a check for $7,383 was written to the Internal Revenue Service with the name of GUAGLIARDO's Daughter in the memo line.

b. Additional Security Company-1 checks, which were made out to GUAGLIARDO or a member of his family, and had not yet been deposited, were recovered from GUAGLIARDO's residence, totaling more than $35,000. These checks were dated one day before the search warrant was executed.

35. Based on my review of bank records and records of a check cashing business located in Brooklyn (the "Check Casher"), I have learned that although JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, had multiple personal bank accounts at the relevant time, including at least one account at the Credit Union, six out of seven checks from Security Company-1 made out to him, totaling more than $32,000, were cashed by GUAGLIARDO at the Check Casher rather than cashed at a financial institution at which GUAGLIARDO had an account or deposited.[9]  I

---

[9]   Based on my review of bank records, I have learned that on or about January 13, 2018, the remaining check from Security Company-1 to GUAGLIARDO, for approximately $3,813, was deposited at a financial institution in an account in GUAGLIARDO's name. I have also learned that the check from Security Company-1 to

have further learned that the Check Casher charged a fee for cashing each of these checks, and that these fees exceeded $600. These cashed checks included ones that GUAGLIARDO had told Individual-1 were "reimbursements" for the vehicle and office space GUAGLIARDO claimed to have secured for Security Company-1 as detailed above.

36.   Based on my review of Credit Union records, including screenshots of surveillance footage, I have learned that on or about January 1 and March 1, 2018, two checks from Security Company-1, totaling $40,000, were deposited by JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, in a Credit Union account in the name of GUAGLIARDO's Daughter, which account listed GUAGLIARDO as its beneficiary.[10]  Between on or about January 1, 2018 and in or about May 2018, approximately $8,000 in cash was withdrawn from the same account through ATMs. Screenshots from video surveillance from Credit Union locations in Manhattan and Brooklyn indicate that GUAGLIARDO conducted the cash withdrawals.

37.   Based on my participation in the judicially-authorized search of the residence of JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," and my discussions with other law enforcement agents who participated in that search, I know that during the search, law enforcement agents found approximately $41,000 in cash in a closet in GUAGLIARDO's bedroom, including approximately three hundred and fifty $100 bills and one hundred and one $50 bills.  That amount of cash, which was in dominations consistent with having been obtained from an ATM and/or check casher, is approximately equal to the total amount of money withdrawn in cash from GUAGLIARDO's Daughter's Credit Union account and that was cashed from checks written from Security Company-1 to GUAGLIARDO.  I also know that agents found in the residence, among other things, the undeposited checks from Security Company-1 described above; an ATM card for Security Company-1, along with a receipt for a financial transaction from the corresponding account; a copy of a check, dated November 14, 2017, from the Credit Union to Security Company-1; papers appearing to reflect Security Company-1

---

GUAGLIARDO's spouse was deposited at the same financial institution, but in a different account in his spouse's name.

[10]   Based on my review of Credit Union records, I have learned that the deposit of the second of the two checks was ultimately not honored, because it did not include Individual-1's signature authorizing the check.

payments; handwritten notes of what appears to be a marketing or
sales pitch for Security Company-1; and a Security Company-1
document purportedly from Individual-1 to Vice President-1
titled "Report of ATMs."

> *GUAGLIARDO's Statements Regarding Security Company-1's
> Business with the Credit Union and the Need to Conceal His
> Connection to Security Company-1*

38.   Based on my review of text messages from a
cellphone that was seized from the residence of JOSEPH
GUALIARDO, a/k/a "Joseph Gagliardo," the defendant, pursuant to
a judicially-authorized search warrant, I have learned, among
other things:

a.   On or about January 21, 2018, shortly after
Employee-1 was hired (and days after GUAGLIARDO learned of a
federal investigation involving Kam Wong, as discussed further
below), GUAGLIARDO appeared to direct Employee-1 not to discuss
his work with any Credit Union employees.   Specifically,
GUAGLIARDO texted: "I'm supposed to tell you don't discuss what
we do find or plan with.   And this is important 'ANYBODY'
Especially not MCU employees Because our work implicate then
[sic]."   Based on my participation in the investigation and my
review of documents, I believe that, in this communication,
GUAGLIARDO was directing Employee-1 not to discuss his work with
any Credit Union employees in order to avoid Employee-1
disclosing and/or discussing GUAGLIARDO's involvement with
Security Company-1.

b.   On or about April 4, 2018, GUAGLIARO engaged
in a text message exchange with the father of Employee-1, who
was a friend of GUAGLIARDO, about the need for Employee-1 to be
discreet about GUAGLIARDO's involvement with Security Company-1.
In particular, GUAGLIARDO texted: "It's not common knowledge.
That I'm running a business[,]" in reference to Security
Company-1, adding that secrecy about his role in the company was
important because "I give [the Chair of the Credit Union's
Supervisory Committee] plausible deniability while I'm doing
this for Kam [Wong]."   The father of Employee-1 apologized to
GUAGLIARDO and promised to "educate" his son, and GUAGLIARDO
reiterated that he "Just need[ed] to give [the Chair] plausible
deniability."

c.   Based on my participation in the
investigation and my review of documents, I believe that in the
above text message exchange, GUAGLIARDO was emphasizing the need
for Employee-1 not to discuss GUAGLIARDO's role with Security

Company-1 with others because it was not "common knowledge"
within the Credit Union, and that while Wong knew GUAGLIARDO was
"running a business," the Chair of the Supervisory Committee did
not, and GUAGLIARDO needed to give him at least "plausible
deniability," in light of the ongoing federal investigation and
internal investigation of the Credit Union.

## Additional Misappropriations by GUAGLIARDO

39.   The investigation has also revealed multiple
additional instances in which JOSEPH GUAGLIARDO, a/k/a "Joseph
Gagliardo," the defendant, requested and received substantial
payments from the Credit Union, including with the agreement and
assistance of Kam Wong, based on false and/or misleading
representations, as set forth in greater detail below.

40.   First, based on my interviews of current and
former Credit Union senior management and my review of Credit
Union records and records of other entities, I have learned that
from at least in or about September 2008 through at least in or
about May 2018, JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the
defendant, with the agreement and assistance of Kam Wong, caused
more than $300,000 in payments to be made to Organization-1, for
which GUAGLIARDO served as President, which both violated Credit
Union policy and provided limited, if any, benefit to the Credit
Union.

41.   Based on my interviews of current and former
Credit Union senior management and Credit Union records, as well
as my review of Organization-1's website, which is no longer
active,[11] I have learned, among other things the following:

a.   Organization-1 hosted an annual dinner in
May of each year in Brooklyn to honor Italian civil service
members, at which JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo,"
the defendant, served as the host and emcee.

b.   At each annual dinner, Organization-1
honored a Credit Union representative, including Board members,
Kam Wong, other Credit Union executives, and even the Credit
Union itself.  Each year, since at least when Wong became CEO,
substantial numbers of Credit Union Supervisory Committee
members, Board members, and executives would attend

---

[11]   I reviewed Organization-1's website both when it was
publicly-accessible and through the assistance of the Internet
Archive's Wayback Machine.

Organization-1's annual dinner, at the Credit Union's expense. Wong approved these expenditures for payment, even though GUAGLIARDO served as the President of this organization.

        c.     Organization-1 maintained a basic website that had limited traffic, for which GUAGLIARDO served as the webmaster.  The website included an advertisement for the Credit Union and identified that the Credit Union was the "exclusive financial institution" of Organization-1.  The website did not appear to have any other paid advertisements, and noted, "Advertisement is needed - we are presently seeking exclusive relationships with organizations for advertisement - in finance, travel, sales."[12]

        d.     Organization-1 annually submitted a letter, signed by its chief financial officer, requesting the Credit Union to serve as Organization-1's advertising sponsor, by purchasing the banner placement on Organization-1's website at the cost of more than $20,000 per year.  The Credit Union's Marketing Department was supposed to decide and recommend whether and on which platforms the Credit Union would advertise. However, with respect to Organization-1, Wong, himself, approved the advertisement, and directed the Accounting Department to pay Organization-1 for these services annually.

        e.     Wong also directed the Credit Union's Marketing Department to assist GUAGLIARDO to place the Credit Union's advertisement on Organization-1's website.  According to the Credit Union's Vice President of Marketing, this was the only website on which Wong directed the Marketing Department to place the Credit Union's advertisement.

        42.    I have interviewed the Credit Union's Vice President of Marketing, who had to access Organization-1's website to place the Credit Union's advertising on the website, at the direction of Kam Wong.  The Vice President of Marketing informed me in sum that, in her view, the advertisements were a waste of the Credit Union's resources and had no legitimate business justification, because Organization-1's website had very little traffic compared to the expense of the advertisement.

---

[12]    Based on my review of Organization-1's accounting records obtained for the years 2013 and 2014, it appears that, at least for those years, Organization-1 did not have any other corporate donors and/or advertisers apart from the Credit Union.

43.    Second, based on my review of Credit Union records, Credit Union records, records received from certain business at which these expenditures were made, and interviews of Credit Union employees, I have learned that, between at least in or about January 2015 and in or about April 2018, JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, had a Credit Union credit card, intended solely to pay for Credit Union business expenses, which GUAGLIARDO used to charge approximately $94,000 in expenditures, many of which appear to be personal in nature.  Moreover, and in violation of Credit Union policy, GUAGLIARDO did not submit expense receipts and expense reports justifying these payments.[13]  In particular, I have learned the following:

a.    Between in or about December 2014 and January 2019, GUAGLIARDO used his Credit Union credit card to charge expensive meals at an Italian restaurant ("Restaurant-1") in Sheepshead Bay, Brooklyn, totaling more than approximately $14,000, including approximately $540 on January 25, 2016; $475 on September 26, 2016; $702 on December 8, 2016; $535 on February 27, 2017; $504 on September 18, 2017; and $580 on January 10, 2018.  The dates of these restaurant charges correspond with meetings GUAGLIARDO had scheduled for Organization-1 at Restaurant-1.

b.    GUAGLIARDO used his Credit Union credit card at a law enforcement supply store in Indiana in or about March 2014 and again in or about March 2016 to charge, in total, more than approximately $2,100.  Records from Supply Store-1 reflect that these charges were for custom badges for GUAGLIARDO, Kam Wong, and the former Chairs of the Supervisory Committee and the Board, which looked like law enforcement badges but with the Credit Union's name on them along with each of the individuals' names and positions.  The badges from 2016 further included the dates "1916 – 2016," in apparent recognition of the Credit Union's centennial celebration.

c.    GUAGLIARDO repeatedly used his Credit Union credit card to pay monthly bills to two wireless phone

---

[13]    Based on my review of Credit Union documents, I know that, despite GUAGLIARDO's non-compliance with the policy on supplying back up documents for reimbursements, the Supervisory Committee, of which GUAGLIARDO was a part, regularly audited the Board's compliance with this policy and found deficiencies in compliance at times.

companies, totaling more than $16,000, even though the Credit Union already paid for a cellphone for him.

        d.    GUAGLIARDO used his Credit Union credit card on or about August 10, 2015 to pay the New York City Department of Finance $115 for a parking ticket he had incurred.

        e.    GUAGLIARDO used his Credit Union credit card on multiple occasions at hotels in New York City, totaling more than $14,000 between in or about October 2015 and December 2017, and to make purchases for Apple iTunes of approximately $2,386.

## GUAGLIARDO's Distribution of Controlled Substances to Kam Wong

        44.    The investigation into JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, has also revealed that beginning in at least in or about 2011 and continuing until at least in or about January 2018, GUAGLIARDO distributed and/or caused the distribution of controlled substances to Kam Wong, initially obtained from GUAGLIARDO's spouse and later from a another doctor, at the same time as Wong was approving invoices for Security Company-1 and Organization-1 for GUAGLIARDO. GUAGLIARDO sometimes delivered the drugs to Wong in person, and on other occasions would have a Credit Union employee pick them up for him, as set forth in greater detail below.

        45.    Based on my review of emails and text messages and New York Bureau of Narcotic Enforcement ("BNE") records, I have learned that JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, and his spouse agreed to and did provide controlled substances, including Hydrocodone and Codeine, to Kam Wong, on multiple occasions.  For example:

        a.    On May 2, 2011, Wong emailed GUAGLIARDO's spouse a request for a prescription of "Promethazine with Codeine, 8 oz. sytrup [sic] - with 1 additional refill," and offered Yankees tickets to GUAGLIARDO's spouse, explaining that "I have reserved one set of the Subway Series tickets for you," and also "have the following Yankees tickets available," listing additional games.  Wong stated: "You can give me your delivery address for the Tickets, and I'll have a messenger delivery and also pick up the prescription at the same time."

        b.    On May 3, 2011, GUAGLIARDO's spouse replied, "no refills are allowed on narcotic prescriptions, so I have sent you three scripts, two without dates.  Before you take them to the pharmacy, make sure you enter the date In the appropriate space with a black pen."

      c.    Also on May 3, 2011, GUAGLIARDO's spouse emailed Wong, "you can give the tickets to Joe or send them with the messenger that is coming to get your script."

      d.    On October 23, 2013, GUAGLIARDO texted Wong, "[GUAGLIARDO's Spouse] will be back Friday. I need name and strength.  Then you can send someone to pick it up after 10 at the office.  Or I'll have her fedex it to you !"

      e.    On October 25, 2013, according to BNE records, a pharmacy in New York, New York filled a prescription for Wong for Promethazine with Codeine, which was written by GUAGLIARDO's spouse.

      f.    On April 16, 2014, Wong texted GUAGLIARDO, "By the way whatever you gave me last time, Hydro something, is working real well. . . . Thanks again!" GUAGLIARDO replied, "Good.  I'll look around for more. Please be careful with them."

      g.    On April 2, 2015, according to BNE records, a Brooklyn pharmacy filled prescriptions for GUAGLIARDO for Hydrocodone and for Promethazine with Codeine, both of which were written by GUAGLIARDO's spouse.

      h.    The next day, on April 3, 2015, GUAGLIARDO texted Wong, "I just picked up a bottle, if you want I'll drop it by tomorrow morning!" Wong replied, "I still have some. Maybe next week or so."

      i.    On April 9, 2015, Wong texted GUAGLIARDO: "Joe: I have the Yankees tickets ready.  Whenever you have a chance, you can stop by and pick them up." GUAGLIARDO replied, "I'm in now.  I have a bottle for you."

      j.    On August 4, 2015, GUAGLIARDO Wong, "Btw. If you can write me another script for.  Cough med. 8 oz. and a hydrocordone [*sic*]. Please." Four minutes later, GUAGLIARDO texted Wong, "That wasn't for you."

      k.    On August 6, 2015, according to BNE records, GUAGLIARDO's spouse wrote prescriptions for GUAGLIARDO for Hydrocodone and for Promethazine with Codeine, both of which were filled on August 10, 2015.

      l.    On September 25, 2015, according to BNE records, a Brooklyn pharmacy filled a prescription for GUAGLIARDO for Hydrocodone, which was written by GUAGLIARDO's spouse.

m.   On September 25, 2015, GUAGLIARDO texted Wong, "I'm sorry I don't remember if I get vicodine can you use them?  It's the same as the medicine I think."  Wong replied, "I am not sure if that will help my allergy but I can try."  (Based on my training and experience, I have learned that Vicodin is the brand name for a combination medication of Hydrocodone, an opioid pain reliever, and acetaminophen.)

n.   On October 11, 2015, Wong texted GUAGLIARDO, "Hey Joe: the pills you gave me is working quite well.  Thank you so much!!"

o.   On October 24, 2016, Wong texted GUAGLIARDO, "Joe: SOS.  My knee is hurting real bad.  Do you have any more pills?"  GUAGLIARDO replied, "I'm supposed to get more on the 26.  That's when I'm due.  I'll see if I have any at home I'm sorry."  Wong replied, "Don't worry.  I still have some.  Once you get your refill, let me know.  I may arrange General Services to FedEx to me[.]"  GUAGLIARDO later responded, "What room are you in I'm going to Fedex pills and cough syrup.  You may get it by tomorrow if I send it now.  The drug store advanced me some."  Wong responded with his room number and wrote, "I don't need the syrup because I still have some.  I need the pills if you can.  Just let me know, I'll have General Services FedEx to me."  GUAGLIARDO replied, "Actually.  If we did it through [the Credit Union].  It's a felony.  I'm just sending them for you to hold in case I come.  I don't like traveling with them. . . . Ok. Let me get to Fedex."

p.   On October 26, 2016, according to BNE records, a Brooklyn pharmacy filled a prescription for GUAGLIARDO for Hydrocodone, which was written by GUAGLIARDO's spouse.

46.   Based on my review of responses to subpoenas issued to GUAGLIARDO's spouse and medical practices with which she has been affiliated, I have learned that neither GUAGLIARDO's spouse nor those practices have any medical records pertaining to the treatment of or prescriptions for either Kam Wong or JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant.

47.   Based on my interviews of Individual-1 and my review of documents, I have learned that JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, told Individual-1, after it was reported in the news that Kam Wong had obtained and/or used certain prescription drugs, that GUAGLIARDO had provided Wong with prescription drugs on at least one occasion,

from GUAGLIARDO's own supply, which GUAGLIARDO claimed to have
obtained for alleged pain from which he suffered.

48.   Based on my review of Kam Wong's emails and text
messages obtained from the Credit Union, and BNE records, I have
learned that JOSEPH GUALGIARDO, a/k/a "Joseph Gagliardo," the
defendant, also supplied controlled substances, specifically,
Hydrocodone and Codeine, to Wong, which GUAGLIARDO obtained from
another doctor who maintained a practice in Staten Island and
was affiliated with the New York City Police Department
("Doctor-1").  For example:

a.   On February 11, 2016, Wong texted
GUAGLIARDO, "Joe: you have anymore pills?  GUAGLIARDO replied,
"That I can do.  I'll be in after I drop my daughter off at
school."

b.   On February 11, 2016, Doctor-1 wrote
prescriptions for GUAGLIARDO for Hydrocodone and Promethazine
with Codeine, which were filled at a Brooklyn pharmacy on
February 15, 2016 and February 17, 2016, respectively, and
purchased by GUAGLIARDO on February 17, 2016.

c.   On April 25, 2016, Doctor-1 wrote
prescriptions for GUAGLIARDO for Hydrocodone and Promethazine
with Codeine, which were filled the same date, and purchased by
GUAGLIARDO on May 2, 2016.  The prescription for Promethazine
with Codeine had a single refill, which was filled by a Brooklyn
pharmacy on May 16, 2016.

d.   On May 2, 2016, Wong texted GUAGLIARDO, "See
if you have some more pills for next time I see you."
GUAGLIARDO replied, "Tomorrow morning. I just picked some up."

e.   On May 4, 2016, Wong texted GUAGLIARDO,
"Thanks for the medicine again."  GUAGLIARDO replied, "What's
mine is yours."

f.   On January 22, 2018, Wong texted GUAGLIARDO,
"Joe: do you have any more pills?"  GUAGLIARDO replied, "I'll
try to get some today Kam."

g.   On January 16, 2018, Doctor-1 wrote a
prescription for GUAGLIARDO for Hydrocodone, which was filled by
a Brooklyn pharmacy on January 21, 2018.  Then, one day after
GUAGLIARDO texted Wong that he was going to try to get some
pills for Wong, on January 23, 2018, the pills were obtained by
GUAGLIARDO from the pharmacy.

49.    Based on my review of Doctor-1's practice's medical records obtained by subpoena, I have learned that Doctor-1's medical practice did not have any records pertaining to the treatment of or prescriptions for Kam Wong. Moreover, while there were records of treatment and prescriptions for JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, there were more prescriptions written to GUAGLIARDO than office visits, indicating that Doctor-1 prescribed Hydrocodone and Codeine to GUAGLIARDO at times without an office visit.

### GUAGLIARDO's Attempts to Cover-Up Kam Wong's Crimes

50.    The investigation has also revealed that, after JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, learned of the USAO-SDNY's investigation, he made attempts to protect himself and Kam Wong from scrutiny, as set forth in greater detail below.

51.    On or about January 17, 2018, I and another law enforcement agent went to Kam Wong's residence in Long Island in an attempt to interview Wong for the first time in connection with this investigation.  Wong was not home at the time, and I left my business card with Wong's spouse.

52.    On or about January 18, 2018, the next morning, before Kam Wong was first interviewed by me and another law enforcement agent later that same day and made false and misleading statements regarding money he had embezzled from the Credit Union, JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, texted Wong, "I'm always loyal to you, but people have to start responding so we can protect ourselves from more than regulators.  This is between us."

53.    Based on my review of Kam Wong's text messages obtained from the Credit Union, I know that on January 19, 2019 -- the day after Wong had first made false statements about money he had embezzled from the Credit Union -- Wong exchanged text messages with JOSEPH GUAGLIARDO a/k/a "Joseph Gagliardo," the defendant, including regarding the investigation.  During that text message exchange, GUAGLIARDO offered to assist Wong, and also requested Wong's assistance with approval of payments for Security Company-1. In particular, GUAGLIARDO asked Wong, "When you get a chance can you look and see where [Security Company-1] invoices are.  I've been putting [Individual-1] off because you were away. Please!" In response to GUAGLARDO's reference to Individual-1, the supposed owner of Security Company-1, Wong then asked, "What's [Individual-1]?" GUAGLIARDO then wrote "[Individual-1] owns [Security Company-1] . . . I

know you have a lot going on I can put him off longer. Just want
to negotiate with him for a better deal and to reorganize."

    54. Based on my review of Credit Union records, I
know that, on or about January 25, 2018, after learning of the
federal criminal investigation, the Credit Union retained
outside counsel and commenced an internal investigation, which
resulted, on or about February 22, 2018, in Kam Wong being
placed on administrative leave. Based on my conversations with
members of the Credit Union's then-current Board of Directors
and my review of email and text messages, I have learned that
JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, made
efforts to attempt to impede the internal investigation,
including seeking to terminate the outside counsel that was
overseeing the internal investigation, at the request of Wong.
For example, on March 2, 2018, Kam Wong texted GUAGLIARDO, "[the
outside counsel] got to go!," and on March 29, 2018, Wong texted
GUAGLIARDO: "They are determined to nail me! The only way for me
to have a chance is [outside counsel] get fired . . . ."
Subsequently, on or about April 15, 2018, GUAGLIARDO requested
an external audit of outside counsel's bills. GUAGLIARDO also
then texted Wong to inform Wong that the Supervisory Committee
had requested an audit of outside counsel's bills for the
expenses related to the internal investigation.

    *GUAGLIARDO's Post-Investigation Meetings With and Provision
of Documents to Individual-1*

    55. As noted above, on or about May 23, 2018, the
residence of JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the
defendant, was searched pursuant to a judicially-authorized
search warrant, as part of the investigation described herein.
Based on my participation in the search, I know that a copy of
the search warrant was provided to GUAGLIARDO. Based on my
interviews of Individual-1 and my review of documents, I have
learned that, subsequent to this search, Individual-1 was served
with a subpoena, and thereafter:

    a. Individual-1 informed GUAGLIARDO that
Individual-1 had been subpoenaed.

    b. GUAGLIARDO and Individual-1 met and
discussed the formation and work of Security Company-1.

    c. GUAGLIARDO told Individual-1, for the first
time, that GUAGLIARDO set up Security Company-1 after discussing
the matter with the former General Counsel of the Credit Union
(the "General Counsel"), who had suggested that GUAGLIARDO form

the company in order to provide certain services to the Credit Union.

d.    Individual-1 asked GUAGLIARDO for reports produced by Security Company-1, so that Individual-1 could be assured that such reports existed and/or work by Security Company-1 was performed.  GUAGLIARDO then provided certain documents to Individual-1 including reports, invoices, and the MOU, which Individual-1 had not previously seen (other than to the extent Individual-1 had been shown such documents by law enforcement).  GUAGLIARDO also, from his personal email account, forwarded Individual-1 emails sent from the Security Company-1 email account, to which, as noted above, Individual-1 did not have access.

e.    On or about August 16, 2019, a few days before Individual-1 was scheduled to meet for the most recent time with the Government, GUAGLIARDO texted Individual-1 a more than 15-paragraph long message.  The message purported to provide an explanation of how and why Security Company-1 was started, GUAGLIARDO's role with Security Company-1, and the payments from Security Company-1 to GUAGLIARDO's Daughter and spouse.  GUAGLIARDO wrote, among other things:

> Around oct of 2017, I engaged in a
> discussion with [initials of Vice President-
> 1] and [first name of Individual-1].  To put
> together a group of people that would visit
> atm locations, identify 'issues' and report
> them to MCU.

> At that point [Security Company-1] was
> formed. With [first name of Individual-1].
> No "compensation" for me was discussed. I
> would be a liaison between MCU and Field
> guys. However, I would be reimbursed for
> expenses.

> . . .

> Where was [Security Company-1] going?

> While I was personally involved as a liaison
> I started exploring an actual physical
> security consulting firm.  Made up of people
> I had worked with over the years. Offering.
> Full range of services.  A vulnerable area I

32

learned were medical facilities such as Dr
offices and dental offices.

. . . This was a concept I discussed with
[first name of Individual-1] and he seemed
interested.  We would pitch my daughter, a
dental hygienist in Florida and my wife a
Derm in NY and NJ to work with us . . . .


. . .

Paying them [GUAGLIARDO's spouse and
daughter] was to keep them engaged.  . . .

We would focus on Smaller practices at
first. I don't recall ever discussing $ with
[first name of Individual-1] as to
compensation. I believed if it took off I
would be compensated.

56.  Based on my review of a memorandum of an
interview of the General Counsel, and my discussions with a law
enforcement officer who interviewed the General Counsel, I have
learned that the General Counsel did not ask JOSEPH GUAGLIARDO,
a/k/a "Joseph Gagliardo," the defendant, to create an outside
company to perform services to the Credit Union, that he did not
know GUAGLIARDO was performing services for the Credit Union on
behalf of or through an outside entity, and that he did not know
Security Company-1 existed until learning about the company
through the internal investigation.

WHEREFORE, the deponent respectfully requests that a
warrant be issued for the arrest of JOSEPH GUAGLIARDO, a/k/a
"Joseph Gagliardo," the defendant, and that he be imprisoned or
bailed, as the case may be.

LaVale Jackson
Special Agent
United States Attorney's Office
Southern District of New York


Sworn to before me this
4th day of October 2019

THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK